**STATE of Missouri, Respondent,**

v.

**Marco Antonio CORTEZ–FIGUEROA, Appellant.**

No. WD 46752.

Missouri Court of Appeals, Western District.

June 8, 1993.

Craig A. Johnston, Office of the State Public Defender, Columbia, for appellant.

Jeremiah W. (Jay) Nixon, Atty. Gen., Joan F. Gummels, Asst. Atty. Gen., Jefferson City, for respondent.

Before FENNER, P.J. and ULRICH and SPINDEN, JJ.

ULRICH, Judge.

Marco Antonio Cortez–Figueroa appeals his conviction of possession of a controlled substance with intent to distribute, § 195.-211, RSMo Supp.1992, a class A felony. He was sentenced to fifteen years imprisonment as a prior drug offender. Mr. Cortez–Figueroa claims that the trial court erred (1) in overruling his motion to quash the jury panel and his purported request to preclude the state from exercising a peremptory strike against the venireperson who he claims was the only Hispanic member of the panel; (2) in failing, *sua sponte*, to preclude the state from filing an amended information changing the charged offense from a class B felony to a class A felony after he elected a jury trial on the original charge; (3) in overruling his motion for judgment of acquittal at the close of all the evidence, contending that the state failed to present substantial evidence supporting the conviction; and (4) in not, *sua sponte*, declaring a mistrial when the investigating officer testified that after he informed Mr. Cortez–Figueroa of his Fifth, Sixth, and Fourteenth Amendment rights pursuant to *Miranda*,[1] Mr. Cortez–Figueroa did not cooperate with law enforcement authorities, thereby violating his right to remain silent pursuant to the Fifth and Fourteenth Amendments to the United States Constitution and article I, sections 10 and 18(a) of the Missouri Constitution.

### Facts Resulting in Charge

On January 7, 1992, the general manager of a hotel in Platte County was requested by a housekeeper employed at the hotel to go to Room 156 within the hotel. The manager responded, went to the room, and found hypodermic needles, white powder on a vanity, razor cuts in the vanity, and white powder residue on the floor. The manager contacted the Platte County Sheriff's Department (Sheriff's Department).

Paul Carrill, Deputy Sheriff with the Sheriff's Department, went to Room 156. Mr. Carrill observed a white powder residue on the writing desk and on the nightstand between the two beds within the room. He also observed cut lines of white powder and scrape marks on the bathroom vanity and a hypodermic syringe in the wastepaper basket. Mr. Carrill collected the powder, the powdery residue, and the hypodermic syringe. He "field tested" the powder residue, and it tested positive for the presence of cocaine hydrochloride.

On January 10, 1992, the front desk supervisor of the hotel contacted the hotel manager at his home at approximately 10 p.m. The supervisor informed the manager that the same person who had occupied Room 156 on January 7, 1992, Richard C. Keller, had again checked into the room. The manager informed a representative of the Sheriff's Department what he had been told by the supervisor, and he arranged to meet Mr. Carrill at the hotel.

Mr. Carrill and Detective Mark Braden, also of the Sheriff's Department, met the manager at the hotel. The law enforcement officers examined a form signed by Richard C. Keller and Mr. Cortez–Figueroa to facilitate their use of a hotel safe deposit box. The completed form was dated January 10, 1992. Mr. Carrill was informed that Mr. Keller and a second person were presently in Room 156.

Law enforcement officers obtained a search warrant to search Room 156, and the room was searched commencing at 1 a.m. on January 11, 1992. Mr. Carrill, Mr. Braden, and three other law enforcement officers knocked on the door of Room 156, yelled "Police, search warrant," and attempted to open the door. The night latch had been utilized, and the law enforcement officers used bolt cutters to open the door. The officers entered the room, Mr. Carrill announcing, "Police, search warrant." Mr. Keller, clothed in underwear, ran into the bathroom and Mr. Braden entered the bathroom after him and restrained him. Mr. Cortez–Figueroa, clothed in his underwear, ran from one of the two beds in the room to a corner of the room. Mr. Carrill ordered him to lie on the ground, and Mr. Carrill handcuffed Mr. Cortez–Figueroa.

---

1. *Miranda v. Arizona,* 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966).

The law enforcement officers seized several items from the room. They seized an open box of Arm and Hammer Baking Soda which had been sitting on a dresser. In the bathroom, they seized a hypodermic syringe found in a trash can, and a blood-stained towelette sitting on the sink vanity. They seized a hypodermic syringe located on top of a blood-stained paper towel on a vanity in the hotel room.

A nightstand was located between the two beds within the hotel room, and the law enforcement officers found several items on and within the nightstand. They observed and seized a metal pipe on the nightstand which contained cocaine residue. The officers seized a blue Crown Royal bag from the nightstand. The bag located on the nightstand was closer to the bed the law enforcement officers determined to have been used by Mr. Keller. The Crown Royal bag contained a ziploc baggie which contained three separate baggies of cocaine hydrochloride having a total weight of 83.42 grams, additional ziploc baggies, four unused hypodermic or insulin syringes, a small set of microgram scales with cocaine residue on it, a white plastic business card for a pipe shop, and a black notebook or personal diary which had telephone numbers in it. Inside the book were entries which reflected sale amounts, costs, and customers.[2] The cocaine found within the bag was estimated to have a worth of between $16,000 and $20,000.

The law enforcement officers also found a blue shaving kit bag on the bottom shelf of the nightstand. The bag contained approximately twenty small ziploc baggies, a baggie accommodating cocaine residue, a number of personal items belonging to Mr. Cortez–Figueroa, photographs of Mr. Cortez–Figueroa and his family, a copper mesh, a large number of business cards, a blue mirror, and miscellaneous papers. The shaving kit was located on the side of the nightstand closest to the bed determined to have been used by Mr. Cortez–Figueroa.

The law enforcement officers searched the drawer of the nightstand. They found a small glass vial with a black top which held a liquid substance and some cocaine residue, a small glass pipe with cocaine residue, a Best Western envelope which contained a noncontraband white powder, a silver-toned spoon, and a torn Coca Cola can with heroin residue on the top of it. A small plastic ziploc bag which contained .56 grams of cocaine hydrochloride was also found within the drawer.

Both Mr. Cortez–Figueroa and Mr. Keller were arrested. Mr. Carrill advised both Mr. Cortez–Figueroa and Mr. Keller of their Fifth, Sixth, and Fourteenth Amendment rights pursuant to *Miranda,* and neither wished to make a statement. Mr. Cortez–Figueroa requested that his watch, rings, and sunglasses located on the nightstand between the two beds be secured as his property. In addition to the other items found in the hotel room, the law enforcement officers found half of a $2 bill in Mr. Keller's billfold, which they found in the room, and the other half of the $2 bill was found in Mr. Cortez–Figueroa's pants pocket. On the half of the $2 bill found in Mr. Cortez–Figueroa's pants pocket was written, "To mi amigo." Mr. Keller had a $100 bill on his person, and the sum of $1,400 in hundred dollar bills was found in the hotel safe deposit box. Mr. Cortez–Figueroa and Mr. Keller were transported to the Platte County Jail.

A special agent of the Drug Enforcement Administration who participated in the search of Room 156 testified at Mr. Cortez–Figueroa's trial. He testified about his experience in law enforcement as a narcotic agent and his training as a special agent of the Drug Enforcement Administration. He stated that he was familiar with the terminology and practices of individuals involved in the use and sale of contraband drugs. He testified that baking soda is used to convert cocaine hydrochloride into cocaine base. He also testified that baking soda is used to "cut" cocaine hydrochloride, there-

**2.** Mr. Carrill testified at trial that he believed the seized black diary or data file belonged to Mr. Keller.

by diluting it and making a larger amount of a less concentrated product. Cocaine hydrochloride is cut to increase profit when the diluted substance is sold, he said. He also testified that small ziploc baggies are common for packaging controlled substances for distribution. He stated that the amount of cocaine hydrochloride found in the Crown Royal bag could easily be cut into two hundred "units," and that someone would possess the amount of cocaine found in the Crown Royal bag for distribution or sale.

After the state rested its case, Mr. Cortez–Figueroa moved for judgment of acquittal, which was denied. Mr. Cortez–Figueroa presented no evidence and rested. He then moved for judgment of acquittal at the close of all the evidence, and the court denied this motion, also.

The jury found Mr. Cortez–Figueroa guilty of possessing a controlled substance with intent to distribute, a class A felony, in violation of section 195.211, RSMo Supp. 1992. The trial court overruled Mr. Cortez–Figueroa's motion for a new trial on August 20, 1992, and sentenced him to fifteen years imprisonment. Mr. Cortez–Figueroa filed a timely notice of appeal.

### Facts Pertaining to Enhanced Charge

Mr. Cortez–Figueroa was initially charged with possession of a controlled substance with intent to distribute, a class B felony, in violation of section 195.211, RSMo Supp.1992. He was arraigned on March 26, 1992. He stated at the arraignment that he wanted a jury trial. The Assistant Prosecuting Attorney informed Mr. Cortez–Figueroa that if he wanted a trial by jury, the charge would be enhanced from a class B felony to a class A felony.

The trial commenced on July 13, 1992. Immediately prior to trial, the Prosecuting Attorney was granted leave to file a first amended information which charged Mr. Cortez–Figueroa with the class A felony of possession of a controlled substance with intent to distribute as a prior drug offender, in violation of sections 195.211, 195.275, and 195.291.1, RSMo Supp.1992.

### Facts Relating to Jury Selection

The trial court conducted a voir dire examination at the commencement of the trial process on July 13, 1992. During the voir dire process, the Prosecuting Attorney used one of the state's peremptory strikes to exclude a member of the venire panel. After the judge informed the members of the venire who had not been selected for jury service that they could leave, Mr. Cortez–Figueroa moved to quash "the jury panel in its entirety," because "[t]here was only one person of Hispanic descent on the entire panel and that person was struck by the State."

### I.

■ As point one on appeal, Mr. Cortez–Figueroa contends that the trial court erred in overruling his motion to quash the jury panel and for allowing the Prosecuting Attorney to peremptorily strike Ruth Thompson, a person he contends to be of Hispanic descent. The impanelment of the jury and the events immediately following are disclosed by the trial transcript:

THE COURT: Mr. Whitaker, would you call out the names of the jury, please?

MR. WHITAKER: As I call your names, please come forward and take a seat in the jury box starting in the back row far chair and in the order that I call you; Kenneth Parkes, Linda Williams, Gladys Johnson, Shellane Lindahl, Jeril Johnson, Genevieve Berg, James Douglas Witt, Roy Furrell, Rodney Hale, Ralph Spence, Deborah Ann Funk, Milton White.

THE COURT: To those of you on the panel who were not selected for either of these two juries, I hope you don't think you wasted your day, because I think you can see that two juries were selected from your midst and another case was disposed of that I assure you would not have been disposed of had you not been here. So, we thank you very much for your service and they're to be back the 20th, is that right?

MR. WHITAKER: The 20th.

THE COURT: So, if you'd be back the 20th of July at about 8:30 in the jury room. You're certainly welcome to stay

and watch the trial, if you want. If you want to leave at this time, you certainly may.

---

(Whereupon counsel proceeded to the bench where the following proceedings were had:)

---

MR. WILSON: Your Honor, at this time, I would make a Motion to Squash [*sic*] the jury panel in its entirety. There was only one person of Hispanic descent on the entire panel and that person was struck by the State. Since this is a Batson issue, I would now raise this and make an oral motion.

■ To protect his right to equal protection, *Batson v. Kentucky*, 476 U.S. 79, 96, 106 S.Ct. 1712, 1723, 90 L.Ed.2d 69 (1986), permits a defendant to establish a prima facie case of purposeful prosecutorial discrimination in the selection of a petit jury solely by the evidence of the prosecutor's exercise of peremptory challenges at the commencement of the defendant's trial. To prove a prima facia showing of purposeful discrimination under *Batson*, the defendant must have shown that he was a member of a cognizable racial minority and that the prosecutor exercised peremptory challenges to remove members of the defendant's race from the venire. *Id.*

In *Powers v. Ohio*, 499 U.S. 400, 111 S.Ct. 1364, 113 L.Ed.2d 411 (1991), the Supreme Court extended *Batson* to protect the equal protection rights of excluded venire persons as well as defendants. *Id.*, at ——, 111 S.Ct. at 1370, 113 L.Ed.2d at 424. The Supreme Court held that a criminal defendant has standing to assert the equal protection rights of venirepersons excluded for racial reasons from jury selection. *Id.*, at ——, 111 S.Ct. at 1373, 113 L.Ed.2d at 428. Additionally, the court held that a criminal defendant may object to the prosecutor's race-based exclusion of a venireperson regardless of the defendant's race. *Id.*, at ——, 111 S.Ct. at 1373–74, 113 L.Ed.2d at 428.

The Supreme Court has continued to define the scope and remedy for peremptory strikes exercised to exclude racial minorities from jury service. In *Edmonson v. Leesville Concrete Co.*, —— U.S. ——, 111 S.Ct. 2077, 114 L.Ed.2d 660 (1991), the Court announced that racially motivated strikes by civil litigants violate the constitution and may be challenged by the opposing party. *Id.*, at ——, 111 S.Ct. at 2088, 114 L.Ed.2d at 680. In *Georgia v. McCollum*, —— U.S. ——, 112 S.Ct. 2348, 120 L.Ed.2d 33 (1992), the Supreme Court stated that a criminal defendant's exercise of peremptory strikes to exclude venire persons stricken from serving on a jury because of race is governed by the constitutional mandates set forth in *Batson*, *Powers*, and *Edmonson*. *Id.*, at —— – ——, 112 S.Ct. at 2358–59, 120 L.Ed.2d at 51.

The Supreme Court of Missouri, in *State v. Parker*, 836 S.W.2d 930 (Mo. banc), *cert. denied*, —— U.S. ——, 113 S.Ct. 636, 121 L.Ed.2d 566 (1992), clarified when a *Batson* challenge is timely and established the procedure to be utilized in Missouri's trial courts when defendants assert timely *Batson* challenges in criminal cases. The Court, eliminating the necessity for the defendant to make a prima facia showing of discrimination, stated:

> First, the defendant must raise a *Batson* challenge with regard to one or more specific venirepersons struck by the state and identify the cognizable racial group to which the venireperson or persons belong. The trial court will then require the state to come forward with reasonably specific and clear race-neutral explanations for the strike. Assuming the prosecutor is able to articulate an acceptable reason for the strike, the defendant will then need to show that the state's proffered reasons for the strikes were merely pretextual and that the strikes were racially motivated.

*Id.* at 939 (citation omitted). Thus, Missouri's trial courts were directed by *Parker* to "conduct an evidentiary hearing to determine whether the prosecutor's peremptory strike was racially motivated when a defendant has properly raised a *Batson* challenge." *Id.* at 940.

■ Therefore, before the trial court can determine the validity of a *Batson* challenge, the challenge must be properly

raised. To be properly raised, the challenge must be timely. Addressing whether the challenge in *Parker* was timely, the Missouri Supreme Court "agree[d] that '[i]t is the release of the unselected members of the venire and the problems and difficulties created thereby which truly govern the timeliness of a *Batson* motion.'" *Id.* at 937 (quoting *McGruder v. State*, 560 So.2d 1137, 1143 (Ala.Crim.App.1989)). The court stated that "the timeliness rule for *Batson* challenges should be devised so as to allow the trial court the opportunity to correct errors and avoid prejudice in the first instance, without unduly hampering the vindication of the equal protection rights *Batson* is meant to protect." *Id.* at 936. The court reasoned that

> Quashing the panel and commencing the jury selection process anew does not really correct the error. The defendant is simply accorded a new opportunity to obtain a jury composed according to race-neutral criteria; the discrimination endured by the excluded venirepersons goes completely unredressed since they remain wrongfully excluded from jury service. Requiring defendants to make *Batson* challenges prior to the venire's dismissal, on the other hand, allows the trial court to determine whether a constitutional violation has occurred while there remains time to correct the error by disallowing the offending strike. Judicial time and resources, moreover, are maximized because there is no need to quash the jury and call a new venire.

*Id.* (footnote and citations omitted).

In this case, the chronology of events is revealing. Both the state and the defendant exercised their peremptory strikes. The court identified and called the names of the members not stricken from the venire who were to comprise the jury, and the members of the jury assumed their assigned seats. The court then spoke to the members of the venire who were not selected to serve on the jury. Following the court's remarks, the court thanked the non-selected venirepersons and instructed them to return on July 20 at 8:30 a.m. for additional service. The court informed the unselected venirepersons that they could stay and watch the trial if they desired. The court then excused the unselected venirepersons by saying, "If you want to leave at this time, you certainly may."

Not until after the unselected members of the venire were discharged did counsel for Mr. Cortez–Figueroa move to quash "the jury panel in its entirety." He stated, "There was only one person of Hispanic descent on the entire panel and that person was struck by the state."[3] The state volunteered its reasons for striking Ruth Thompson, apparently the venireperson Mr. Cortez–Figueroa contended to be of Hispanic descent.

Mr. Cortez–Figueroa's *Batson* challenge was raised after the unselected members of the venire were discharged. The trial court could not correct the error by disallowing the offending strike, assuming arguendo that the prosecutor's peremptory strike violates *Batson* and its progeny. Because the challenge was not raised before the venire was excused, the challenge was not timely and, therefore, not properly made. *Id.* Point one is denied.

## II.

Mr. Cortez–Figueroa claims as point two on appeal that the court erred, *sua sponte*, in allowing the state to file an amended information changing the offense charged from a class B felony to a class A felony, thereby increasing his potential punishment. Mr. Cortez–Figueroa claims that the state amended the information because he would not plead guilty to the initial charge, a class B felony, and asserted his right to trial by jury. Because Mr. Cortez–Figueroa did not object to the claimed error in his motion for a new trial or before, the claimed error is not preserved for appellate review. He asks this court to review his contention as plain error. Rules 29.12 and 30.20.

---

**3.** Whether the objection was sufficient to raise a *Batson* challenge, whether counsel's statement alone that the venireperson was Hispanic, and whether Hispanics are a cognizable racial minority are not addressed.

Mr. Cortez–Figueroa was originally charged by information with violating section 195.211.1, possessing a controlled substance with intent to distribute. The statute provides that, except for five grams or less of marijuana, violation constitutes a class B felony. § 195.211.2. However, section 195.291.1 provides that any person who is convicted of violating section 195.211.2 and who is a prior drug offender shall be sentenced as a class A felon.

Section 195.275.1(1) defines a prior drug offender as "one who has previously pleaded guilty to or has been found guilty of any felony offense of the laws of this state, or of the United States, or any other state, territory or district relating to controlled substances." That Mr. Cortez–Figueroa qualified as a prior drug offender and satisfied the provisions of section 195.211.1 for enhanced sentencing as a class A felon for penalty assessment is not contested.

When Mr. Cortez–Figueroa appeared for arraignment on the class B felony charge, the following dialogue occurred:

MR. WILSON: We can go ahead and set the matter for a trial on May the 14th, if that would be better for The Court's docket, Your Honor.

THE COURT: That will be for a Court tried case or do you want to try it to a jury?

MR. WILSON: Do you want a jury trial or do you want to try it to the bench?

THE DEFENDANT: Jury.

MR. WILSON: Jury trial, Your Honor.

MR. FERGUSON: We're going to enhance him then, if he wants a jury trial.

MR. WILSON: Okay, no problem.

THE COURT: The matter is set for jury trial on Monday, June 1, 1992, at nine a.m.

MR. WILSON: June 1?

THE COURT: Yes, sir.

MR. WILSON: All right. Thank you, Your Honor.

THE COURT: Yes, sir.

The day trial was to commence, the state obtained permission from the trial court to enhance the offense charged in the information from a class B felony to a class A felony. The first amended information was filed before trial started and alleged Mr. Cortez–Figueroa had been previously convicted of a controlled substance-related felony in Arizona and was, therefore, a prior drug offender and subject to class A felony punishment if convicted of the charged offense. Counsel for Mr. Cortez–Figueroa never objected to the charged offense being enhanced from a class B to a class A felony.

The transcript of the arraignment is the only evidence in this case which contributes to resolution of the issue. When Mr. Cortez–Figueroa, through counsel, announced that he was not willing to try the case to the court and that he wanted a jury trial on the pending Class B felony charge, the prosecutor announced that he would enhance the charge to a Class A felony "if he [Mr. Cortez–Figueroa] wants a jury trial." Thus, while the record does not support Mr. Cortez–Figueroa's claim that the enhanced charge was filed because he would not plead guilty to the lesser charge, the record does disclose that if Mr. Cortez–Figueroa had elected to waive his right to a jury trial and had consented to a judge-tried case, the prosecuting attorney would not have enhanced the charge from a class B felony to a class A felony.

Mr. Cortez–Figueroa relies on *State v. Quimby,* 716 S.W.2d 327 (Mo.App.1986), for the rule that a defendant is entitled to a jury trial when charged with a felony offense "without fear that an attempt to exercise that right would expose him to the risk of a substantially increased punishment." *Id.* at 331. In *Quimby,* the prosecuting attorney had charged the defendant with assault in the third degree, a Class A misdemeanor. On the day of the scheduled trial, the pending charge was dismissed and a complaint was filed by the prosecutor charging the defendant with first degree burglary, a class B felony, the offense for which the defendant was convicted and from which he appealed. Both the misdemeanor assault and the felony burglary charges arose from the same incident. *Id.* at 328. The court in *Quimby* determined from the record that, as the misdemeanor trial was about to begin, the prosecutor

gave the defendant the choice of proceeding to trial on the pending charge by waiving a jury or confronting the enhanced Class B felony charge if he elected to exercise his right to trial by jury on the misdemeanor charge. *Id.* at 329. The court ruled that, under the facts presented, as a matter of law, the trial court erred in denying defendant's motion to dismiss the Class B felony charge of first degree burglary. *Id.*

■ Enhancing a charge because the defendant elects to exercise his right to trial by jury is vindictive. In *Quimby,* the court stated that "[t]here is no presumption [of vindictiveness] if the realignment of charge occurs in the process of plea bargaining or in the absence of some evidence of actual vindictiveness calculated to thwart exercise by an accused of a due process right." *Id.* at 330. The court in *Quimby* found no evidence of plea bargaining and no factual basis for determining other than that the felony enhancement was filed in retaliation because the defendant requested a jury trial on the pending Class A misdemeanor charge. *Id.* The court noted that

[T]he only proof in the case shows a threat by the prosecutor to increase the charge if a jury were requested to try the misdemeanor case. The dismissal of the original charge and the substitution of the felony complaint implemented the prosecutor's stated threat to retaliate against appellant.... [A]ppellant here was entitled to a jury trial on the original charge without fear that an attempt to exercise that right would expose him to the risk of a substantially increased punishment.

*Id.* at 331.

■ Because the issue was not preserved, it is reviewed for plain error. To successfully assert plain error, Mr. Cortez–Figueroa must "go beyond a mere showing of demonstrable prejudice to show manifest prejudice affecting his substantial rights." *State v. Hornbuckle,* 769 S.W.2d 89, 93 (Mo. banc 1989), *cert. denied,* 493 U.S. 860 (1989). He must show that if the error is uncorrected, a "manifest injustice or miscarriage of justice inexorably results."

*State v. Valentine,* 646 S.W.2d 729, 731 (Mo.1983) (quoting *State v. Miller,* 604 S.W.2d 702, 706 (Mo.App.1980)). Whether plain error exists must be determined from examination of the particular facts and circumstances in each case. *Valentine,* 646 S.W.2d at 731. Both Rules 29.12(b) and 30.20 provide that "plain errors affecting substantial rights may be considered in the discretion of the court when the court finds that manifest injustice or miscarriage of justice has resulted therefrom."

■ Whether the state enhanced a charged offense because a defendant demanded his right to jury trial is an issue that must be timely raised to permit the trial court to consider and address the issue before trial. Rule 24.04(b)(2) provides:

*Defenses and Objections Which Must be Raised.* Defenses and objections based on defects in the institution of the prosecution or in the indictment or information other than that it fails to show jurisdiction in the court or to charge an offense may be raised only by motion before trial. The motion shall include all such defenses and objections then available to the defendant. Failure to present any such defense or objection as herein provided constitutes a waiver thereof, but the court for cause shown may grant relief from the waiver. Lack of jurisdiction or the failure of the indictment or information to charge an offense shall be noticed by the court at any time during the pendency of the proceeding.

In *Quimby,* the state dismissed the misdemeanor charge and filed a felony charge because the defendant demanded his right to trial by jury on the misdemeanor charge. The defendant in *Quimby* moved to dismiss the felony charge before trial and renewed his objection in his motion for a new trial. Thus, the actions of the defendant in *Quimby* complied with Rule 24.04(b)(2) and permitted the trial court to address the issue. The defendant in *Quimby* preserved the constitutional issue for appellate review.

■ Mr. Cortez–Figueroa failed to present his objection by motion to the trial

court before trial as required by Rule 24.-04(b)(2). His objection does not allege that the court lacked jurisdiction. Neither has he alleged good cause for failing to timely assert his objection. Pursuant to Rule 24.-04(b)(2), he waived the objection. To permit Mr. Cortez–Figueroa to decline to timely assert before trial any right he might have to oppose the enhancement of the charge and then to raise the issue for the first time on appeal would permit him to avoid the requirement of Rule 24.04(b)(2) and "sandbag" the state. Mr. Cortez–Figueroa has not established plain error. Point 2 is denied.

### III.

■ As point 3 on appeal, Mr. Cortez–Figueroa claims that the state failed to produce sufficient evidence to convict him of knowingly possessing cocaine with intent to distribute, and that the court erred in denying his motion for judgment of acquittal at the close of all the evidence. He avers that the state failed to present sufficient evidence that he knowingly possessed the cocaine seized from the hotel room and that he possessed it with the intent to distribute.

When reviewing whether the state has presented sufficient evidence to support a conviction, the facts in evidence and all inferences that can reasonably be drawn from the evidence must be viewed in the light most favorable to the verdict, and all contrary evidence and inferences must be discarded. *State v. Clifford,* 815 S.W.2d 3, 5 (Mo.App.1991). Appellate courts, reviewing the evidence for sufficiency, do not weigh the evidence, but rather determine whether there was sufficient evidence from which a reasonable person could conclude that the defendant is guilty as charged. *State v. Vitale,* 801 S.W.2d 451, 456 (Mo.App.1990).

■ To convict Mr. Cortez–Figueroa, the state must have proved beyond a reasonable doubt that he had "actual or constructive possession of the substance with knowledge of the fact of possession." *State v. West,* 559 S.W.2d 282, 285 (Mo.App.1977). The test is "whether 'the de-fendant was aware of the presence and character of the particular substance and was intentionally and consciously in possession of it.' " *Id.* (quoting *State v. Young,* 427 S.W.2d 510, 513 (Mo.1968). Possession of a controlled substance and knowledge of its possession may be proved by circumstantial evidence. *State v. Barber,* 635 S.W.2d 342, 343 (Mo.1982).

Mr. Cortez–Figueroa relies on the case of *State v. Moiser,* 738 S.W.2d 549 (Mo.App. 1987), for support of the proposition that the presence of more than one person at a scene where contraband drugs are seized requires the state to prove more than the defendant's mere presence and proximity to the controlled substance, even if it is in plain sight, in order to prove possession. *Id.* at 558. In *Moiser,* the defendant presented evidence that at the time a large amount of marijuana was seized from a residence, his wife lived in the residence, but he did not. Three persons in addition to the defendant were in the residence when law enforcement officers searched it. The court reversed the defendant's convictions and stated that evidence of corroborating, incriminating circumstances beyond joint control is necessary to make a submissible case. *Id.*

*Moiser* is not analogous to this case. In *Moiser,* the court noted that no evidence was presented that the defendant owned, lived at, or was a regular visitor to the residence where the contraband was discovered while the defendant and others were present. In this case, evidence was presented that Mr. Cortez–Figueroa was occupying the room and controlled the contraband substance at least to the same extent as Mr. Keller. Mr. Cortez–Figueroa was present in Room 156 when law enforcement officers entered. He was attired in his underwear and had been reclining on one of the two beds in the room. His personal jewelry and watch were on the nightstand between the two beds in the room. Two used syringes were found. Mr. Cortez–Figueroa had signed a form to use a hotel safe-deposit box as a temporary occupant of Room 156. Cocaine hydrochloride totaling 83.42 grains and having an estimated

worth of $16,000 to $20,000 and additional syringes were found in ziploc baggies in a Crown Royal bag located on the nightstand between the two beds. An opened box of baking soda, which is used to "cut" cocaine and also used to make "crack" cocaine, was located on a dresser in plain view. A small microgram scale with cocaine residue was found with the cocaine in a Crown Royal bag located between the two beds in a nightstand. A notebook with telephone numbers in it along with entries which reflected sale amounts, costs, and customers was found in the nightstand. Two telephone books were also in the Crown Royal bag. A blue shaving kit was found in the nightstand in which were many ziploc baggies and photographs of Mr. Cortez–Figueroa and his family. A "white chunky" substance found in the shaving kit proved to be .56 grams of cocaine hydrochloride. Inside a drawer of the nightstand were a glass vial with white residue, a silver-tone spoon, a torn coca-cola can, burned on the bottom, with a brown heroin residue on top, identified without objection as drug paraphernalia. The man's wallet and sunglasses found in the drawer belonged to Mr. Cortez–Figueroa. Inside Mr. Keller's billfold was half of a two-dollar bill. The other half of the two-dollar bill was in Mr. Cortez–Figueroa's pants pocket. Written on the half of the two-dollar bill found in Mr. Cortez–Figueroa's pocket were the words, "To mi amigo."

Considering the evidence and the reasonable inferences drawn from the evidence in a light most favorable to the verdict, the evidence was sufficient for the jury to conclude beyond a reasonable doubt that Mr. Cortez–Figueroa was guilty of possessing cocaine with the intent to distribute the substance. Point 3 is denied.

### IV.

■ As his fourth and final point on appeal, Mr. Cortez–Figueroa claims that the trial court erred in failing to declare a mistrial, *sua sponte*, when Deputy Sheriff Carrill commented upon Mr. Cortez–Figueroa's exercise of his Fifth Amendment right to remain silent after he was advised of his rights as required by *Miranda.*

Deputy Sheriff Carrill's comments occurred when he was questioned about whether Mr. Cortez–Figueroa made statements asserting ownership of the sunglasses found in Room 156. The applicable testimony was as follows:

Q I want to talk a little bit about this pair of sunglasses. Did the defendant make any statements to you concerning the sunglasses?

A Yes, he did.

Q What statement did he make to you concerning the sunglasses?

A Several minutes to an hour later following the identification and the recovery of the larger portion of the drugs, we then once advising the defendants of their *Miranda* warning and that they did not want to cooperate with law enforcement, it was decided to go ahead and transport the two defendants; being Mr. Keller and Mr. Figueroa, to the Platte County Sheriff's Department Jail. As we started to dress these parties out, as I was dressed or assisting to dress out Mr. Figueroa, he had made the statement to me that he wanted to make sure that his watch and his rings from the top of the nightstand made their way into his property, and specifically the Serengeti sunglasses, because they were expensive.

Mr. Cortez–Figueroa did not object to Deputy Sheriff Carrill's applicable testimony. Additionally, the point raised on appeal was not included in Mr. Cortez–Figueroa's motion for a new trial. Because the point was not preserved by timely objection during trial and presented to the trial court in a timely motion for a new trial, this point is reviewable only as plain error.

"[A]n accused's failure to volunteer an exculpatory statement is not admissible as an admission.... The admission of such evidence constitutes an invasion of an accused's constitutional rights." *State v. Mathenia,* 702 S.W.2d 840, 842 (Mo. banc), *cert. denied,* 477 U.S. 909, 106 S.Ct. 3286, 91 L.Ed.2d 574 (1986) (quoting *State v.*

*Stuart,* 456 S.W.2d 19, 22 (Mo. banc 1970)). The supreme court, quoting from *State v. Nolan,* 595 S.W.2d 54, 56 (Mo.App.1980), stated in *Mathenia:* "The state may not use [postarrest] silence as [1] affirmative proof or [2] to impeach the defendant's testimony." *Id.*

Like *Mathenia,* this case does not disclose that reference to Mr. Cortez–Figueroa's postarrest silence was used as "affirmative proof" or "to impeach" his testimony. The undesirable comment by the witness that the defendants "did not want to cooperate with law enforcement" after the *Miranda* warning was administered came in response to the prosecutor's question whether Mr. Cortez–Figueroa made a statement regarding sunglasses which were found in Room 156. The unnecessary and undesirable comment was related by the witness in response to the prosecutor's question as a part of the chronology which included Mr. Cortez–Figueroa's claim of ownership regarding the Serengeti sunglasses found in Room 156. Deputy Sheriff Carrill's testimony was not offered as (1) affirmative proof or (2) to impeach appellant's testimony.

 Additionally, the evidence of guilt was overwhelming, and review of the record as a whole supports the conclusion that, beyond a reasonable doubt, the jury's verdict would not have been different absent the statement. Therefore, plain error has not been demonstrated. Point IV is denied.

The judgment of conviction is affirmed.

All concur.